Argued and submitted June 14, reversed and remanded October 9, 1985

# DAVIS et ux,
*Appellants,*

*v.*

# VESELY,
*Respondent.*

## (A8208-05257; CA A33191)

707 P2d 627

Kelly L. Andersen, Central Point, argued the cause and filed the briefs for appellants.

Gerald R. Pullen, Portland, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

This legal malpractice case arises out of an earlier aborted legal malpractice case. In the underlying case, plaintiffs retained defendant to represent them in the malpractice case against an attorney named Heisel. That action was dismissed, because defendant failed to commence it within the time permitted by law. Plaintiffs then brought this malpractice action. Defendant concedes his negligence in the underlying action but contends that plaintiffs would not have prevailed in that action and, therefore, were not damaged by his negligence. The trial court agreed and directed a verdict in defendant's favor. We reverse and remand.

An action for legal malpractice is not fundamentally different from other actions for negligence. The elements are a duty of care, breach of that duty, causation and damages. *Harding v. Bell,* 265 Or 202, 204, 508 P2d 216 (1973). Here, given defendant's duty to plaintiffs and his breach, plaintiffs' sole burden in this case within a case within a case is to prove that they would have recovered damages in their action against Heisel.

In order to understand the issues presented, the facts that gave rise to the original underlying action are necessary. Prior to October 1, 1973, plaintiffs, husband and wife, owned all but two of the outstanding shares of Hydraulic Service and Supply, Inc. (HSS). James Hall, manager of the business, owned the other two outstanding shares. Plaintiff A. B. Davis wanted to retire, and Hall wanted to acquire the business. They arrived at a tentative agreement on the price and terms of payment and agreed to complete the transaction no later than October 1, 1973. Plaintiffs retained Heisel to work out the final contract with Hall's attorney. The contract that was finally approved was drafted by Hall's attorney after consultation with Heisel and plaintiffs' accountant. Heisel assured plaintiffs that "all bases are covered" before they signed the contract.

On October 1, 1973, the contract was signed. Rather than being a sale of stock or assets to Hall, the contract provided that plaintiffs' shares in HSS were to be purchased by the corporation, leaving Hall the sole shareholder. That structure of the transaction was intended to minimize the tax

burden on both Hall and plaintiffs. Plaintiffs were to surrender their shares to the corporation, which, in turn, was to deposit the shares with an escrow agent. Plaintiffs were to receive the purchase price of $75,000 from HSS, payable in monthly installments of not less than $800, with 8 percent interest on unpaid balances.

The contract further provided that payments by the corporation were to be made out of corporate surplus and that, if sufficient surplus was not available on any installment due date and if the inadequacy could not be remedied through accounting practices, Hall agreed to pay into the corporation sufficient funds to create a surplus sufficient to pay the installment then due.[1] If the corporation defaulted on its obligation to make the installment payments and continued in default for more than 30 days after notice, plaintiffs had the right to accelerate the principal amount, and the escrow agent was authorized to offer at public sale all of the shares remaining on deposit with it. In that event, the proceeds of sale, if any, were to be applied on the unpaid balance then owing to plaintiffs after deducting expenses.

During the four years following execution of the agreement, payments totalling approximately $32,000 were made. Apparently, however, the corporation experienced financial difficulties during that period and was unable to pay all of its bills as they became due.[2] As a consequence, a creditors' suit was filed against HSS and plaintiffs on October 15, 1977, alleging that the 1973 purchase agreement rendered

---

[1] Paragraph 6 of the agreement provides:

"**CREATION OF SURPLUS.** If at the due date of any installment payment, the Corporation does not have sufficient surplus out of which to pay such installment, Hall and the Corporation shall take all required action to enable the Corporation to make such payment out of surplus, including, without limitation, the recapitalization of the Corporation so as to reduce its capital and increase its surplus or a reappraisal of the Corporation's assets to reflect the market value of the assets of the Corporation in the event such market value exceeds the book value thereof. If the surplus of the Corporation at the time when such action is required to be taken hereunder, shall not, for any reason, be sufficiently increased to provide the necessary surplus with which to pay the installment payment or payments within ten days of the due date, Hall shall contribute to the Corporation amounts sufficient to create a surplus in an amount at least equal to such installment payment or payments."

[2] In Oregon, corporate insolvency is defined by statute. ORS 57.004(8) provides: " 'Insolvent' means inability of a corporation to pay its debts as they become due in the usual course of its business."

the corporation insolvent in violation of ORS 57.390;[3] that payments were made under the agreement when the corporation was insolvent and had no earned surplus, in violation of ORS 57.035(1) and (5);[4] and that plaintiffs had received dividends from the corporation when it was insolvent, in violation of ORS 57.216.[5] That action was settled under an agreement whereby plaintiffs relinquished any further claims against HSS under the purchase agreement in exchange for $4,000 in cash and a release from personal liability to the creditors. As a result of the settlement, plaintiffs realized a total of approximately $36,000, rather than $75,000, from the sale of their business.

Plaintiffs hired defendant to represent them in a malpractice action against Heisel approximately one year after the creditors' suit was filed. Defendant did not file a complaint on plaintiffs' behalf, however, until October 25, 1979, after the Statute of Limitations had expired, resulting in its dismissal.

The dismissed complaint alleged that Heisel was negligent in the following respects:

---

[3] ORS 57.390 provides:

"No redemption or purchase of redeemable shares shall be made by a corporation when it is insolvent or when such redemption or purchase would render it insolvent, or which would reduce the net assets below the aggregate amount payable to the holders of shares having prior or equal rights to the assets of the corporation upon involuntary dissolution."

[4] ORS 57.035 provides, in pertinent part:

"(1) A corporation shall have the right to purchase, take, receive or otherwise acquire, hold, own, pledge, transfer or otherwise dispose of its own shares, but purchases of its own shares, whether direct or indirect, shall be made only to the extent of unreserved and unrestricted earned surplus available therefor, and, if the articles of incorporation so permit, or with the affirmative vote of the holders of at least a majority of all shares entitled to vote thereon, to the extent of unreserved and unrestricted capital surplus available therefor.

"* * * * *

"(5) No purchase of its own shares shall be made at a time when the corporation is insolvent or when such purchase would make it insolvent."

[5] ORS 57.216 provides:

"The board of directors of a corporation may, from time to time, declare and the corporation may pay dividends on its outstanding shares in cash, property or its own shares, except when the corporation is insolvent or when the payment thereof would render the corporation insolvent or when the declaration or payment thereof would be contrary to any restrictions contained in the articles of incorporation."

"(1)    [Heisel] failed to warn Plaintiffs that, upon HSS's failure to pay Plaintiffs out of corporate surplus, creditors could proceed against Plaintiffs.

"(2)    [Heisel], knowing that Plaintiff A. B. Davis was of retirement age and desired to completely sever himself from the affairs of HSS, failed to protect said Plaintiff's interest by advising him to sign an agreement that did not include a mechanism whereby Plaintiffs could prevent the making of payments out of anything but corporate surplus.

"(3)    [Heisel] failed to provide an alternative arrangement whereby Plaintiffs would be paid by Hall, rather than HSS, which would have prevented any possible creditors' suits."

It further alleged that, as a direct and foreseeable result of that negligence, plaintiffs were damaged in specified amounts.

■■    At the close of plaintiffs' case in this proceeding, defendant moved for a directed verdict on the grounds that the agreement was not illegal and that any damage plaintiffs suffered was caused by the "intervening and superseding act of a party to the agreement, Mr. Hall, who entered into a conspiracy with a competitor of the corporation to take it over." The trial court agreed that the contract was not illegal; the complaint filed by Vesley on plaintiffs' behalf did not allege that it was.[6] The trial court did not address defendant's second ground, which, apparently, was premised on plaintiffs' allegations in pleadings in the action by HSS's creditors against them. However, the conspiracy was not established in that case; whether there was one that caused plaintiffs' damages could have been, but was not, asserted by defendant as an affirmative defense. ORCP 19B.[7] Plaintiffs did not

---

[6] The illegality question was raised in the creditors' action against plaintiffs. As indicated, that case was settled. Plaintiffs' attorney in that case had concluded that, although the contract was not illegal *ab initio*, some of the payments made to plaintiffs by HSS were made when the corporation was insolvent. Defendant characterizes the creditors' suit as completely unfounded and suggests that plaintiffs should not have settled it. That claim might be a basis for an affirmative defense, but not for a directed verdict at the close of plaintiffs' case.

[7] ORCP 19B provides:

"In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, comparative or contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, unconstitutionality,

attempt to prove a conspiracy in their case in chief, although they admitted that they had alleged one in their pleadings in the creditors' action. Defendant's motion should have been denied on the grounds relied on.

However, the trial court *sua sponte* reviewed the three allegations of negligence asserted in the complaint against Heisel and concluded that there was insufficient evidence to submit any of the allegations to the jury. Accordingly, it granted defendant's motion on that ground. In doing so, the court erred.

■      Plaintiffs' expert witness testified that Heisel did not exercise the ordinary care and diligence used by lawyers in the community, because he failed to prepare an agreement that would not subject plaintiffs to future liability and because he failed to inform plaintiffs of their potential liability to HSS creditors. He further testified that the events that transpired were foreseeable. Without commenting on the second and third specifications of negligence in the complaint filed against Heisel, we conclude that the testimony and other evidence presented was sufficient to present a jury question as to whether the four elements of a legal malpractice claim were proven with respect to the first allegation of Heisel's negligence. *See Harding v. Bell, supra.* The trial court erred in granting defendant's motion for a directed verdict.

Reversed and remanded.

waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."